IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WITT COMPANY, an Oregon
corporation,                                             No. 03:13-cv-00166-HZ

             Plaintiff,

      v.                                              OPINION & ORDER

RISO, INC., a Massachusetts corporation,

             Defendant.

John F. McGrory, Jr.
Kaley L. Fendall
DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610

       Attorneys for Plaintiff

Thomas M. Triplett
Roman D. Hernandez
SCHWABE, WILLIAMSON & WYATT
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204

/ / /

1 - OPINION & ORDER

Edwin G. Harvey
Matthew L. Landwehr
David M. Mangian
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101

 Attorneys for Defendant

HERNANDEZ, District Judge:

 Plaintiff Witt Company brings this antitrust action against Defendant RISO, Inc.,

contending that Defendant has violated the Sherman and Clayton Acts with an unlawful tying

arrangement.  Plaintiff also brings state law claims of intentional interference with economic

relations, breach of contract, and breach of the implied duty of good faith and fair dealing.

 Defendant moves to dismiss the four claims.  I agree with Defendant that depending on

how the antitrust claim is construed, it is either barred by the statute of limitations or fails to state

a claim.  I further agree with Defendant that the state law claims fail to state a claim and that this

Court lacks personal jurisdiction over Defendant as to the contract-based claims.  I grant the

motion to dismiss.

BACKGROUND

 The facts are taken from the Complaint with some additional facts provided by Exhibits

A-1 to A-4 to the March 27, 2013 Kathryn Hawkes Declaration.  The Complaint refers to and

quotes from these exhibits and neither party questions their authenticity.  Plaintiff raises no

objection to considering them in resolving the motion to dismiss.  Therefore, I rely on them in the

context of this motion.  See Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010)

(court may consider materials incorporated into the complaint or matters of public record)

2 - OPINION & ORDER

Plaintiff provides office technology products and related services, including hardware, software, and supplies, as well as both maintenance and consulting services for document imaging, document output, and digital storage.  Compl. at ¶ 1.  Defendant manufactures and distributes hardware and supplies for document printing and duplicating.  Id. at ¶ 2.

Plaintiff has been an authorized dealer of RISO digital duplicators and other related products since approximately 1988.  Id. at ¶ 7.  As such, it entered into several RISO Domestic Dealer Agreements ("Dealer Agreements") from time to time which set forth the terms and conditions of the parties' business relationship.  Id.

On April 1, 2007, Plaintiff and Defendant entered into a 2007 Dealer Agreement.[1]  Id. at ¶ 8; see also Ex. A-1 to Mar. 27, 2013 Hawkes Decl.  In December 2009, Defendant offered to replace the 2007 Dealer Agreement with a succeeding Dealer Agreement which contained terms Plaintiff objected to.  Id. at ¶ 9.  The 2007 Dealer Agreement ceased to remain in effect sometime in March 2010, ninety days after Defendant offered the succeeding Dealer Agreement which Plaintiff did not execute.  Id. (citing 2007 Dealer Agreement termination paragraph 4(b)(ii)).

Plaintiff has not been a party to any Dealer Agreement with Defendant since the 2007 Dealer Agreement ceased to be effective (with the exception of a ninety-day period discussed below).  Id.  Despite the absence of a formalized Dealer Agreement with Defendant, Plaintiff has continued to be an authorized RISO dealer as of the time this Complaint was filed on January 29,

---

[1]  Defendant refers to this same agreement as the "FY 2008 Dealer Agreement."  Because the Complaint refers to it as the "2007 Dealer Agreement," I have as well.  Additionally, even though the Complaint refers to the "2007 Dealer Agreement" in the singular, there were multiple 2007 Dealer Agreements pertaining to multiple geographic areas.  Exhibit A-1 to the March 27, 2013 Hawkes Declaration contains a full copy of the 2007 Dealer Agreement for Plaintiff's Brea, California location, as well as relevant pages from identical 2007 Dealer Agreements pertaining to Oregon and Washington.

2013.  Id.

On April 1, 2011, the parties executed an Asset Purchase Agreement (APA) under which

Plaintiff acquired from Defendant markets in two counties in California and five counties in

Arizona.  Id. at ¶ 10; see also Ex. A-2 to Mar. 27, 2013 Hawkes Decl.  Under the APA, Plaintiff

paid Defendant $700,000 for the purchase of Defendant's operations in those markets.  Id. at ¶

11; Ex. A-2 to Hawkes Decl. at §§ 1.10, 1.11.

Plaintiff alleges that approximately two weeks before the closing of the APA, Defendant

told Plaintiff that Plaintiff had to sign a new Dealer Agreement as part of the closing of the APA.

Compl. at ¶ 12.  Plaintiff objected to executing a new Dealer Agreement because of terms it

considered to be overly restrictive.  Id. at ¶ 13.  Plaintiff told Defendant it would not finalize the

APA if it was required to sign the new Dealer Agreement.  Id.  Among other things, Plaintiff

objected to paragraph 3 of the new Dealer Agreement which provided that

> [d]uring the term of this Agreement, Dealer shall not also be a dealer for, nor
> make sales of, digital duplicators, accessories, or parts or supplies for digital
> duplicators, directly or substantially competitive with [RISO] Products.

Id.

Plaintiff objected to paragraph 3 because it would deny Plaintiff the right to purchase and

sell RISO digital duplicators unless it also agreed to exclusively purchase RISO brand supplies

for use in RISO equipment, and not use any competitive supplies.  Id. at ¶ 14.  At the closing of

the APA, Plaintiff and Defendant agreed to reinstate the terms of the 2007 Dealer Agreement for

a period of ninety days following the execution of the APA so that the parties could attempt to

negotiate terms that would be acceptable to Plaintiff.  Id.  They further agreed to "attempt in good

faith" to resolve their concerns about the proposed Dealer Agreement so that the "terms of the

reinstated Dealer Agreement may be replaced by a new dealer agreement." Id. at ¶ 15 (citing section 5.7 of the APA).

After the APA closing, Plaintiff made "several good-faith efforts" to negotiate a new Dealer Agreement. Id. at ¶ 16. Plaintiff alleges that RISO was largely non-responsive. Id. Eventually, Defendant presented Plaintiff with a new Dealer Agreement on September 12, 2012. Id. at ¶ 17; see also Ex. A-3 to Mar. 27, 2013 Hawkes Decl. Plaintiff alleges that Defendant told Plaintiff that Plaintiff would be required to execute a new Dealer Agreement to remain an authorized dealer. Id. On September 20, 2012, Defendant sent Plaintiff a letter stating that if Plaintiff did not sign a new Dealer Agreement, Plaintiff's status as an authorized RISO dealer would expire on March 31, 2013.[2] Id. at ¶ 18; Ex. A-4 to Hawkes Decl.

Plaintiff alleges that the September 20, 2012 Letter specifically stated that Plaintiff's acceptance of the new Dealer Agreement constituted an acknowledgment that it would abide by paragraph 3 of the Dealer Agreement which prohibits the sale of any digital duplicators, accessories, parts, or supplies that compete with RISO products. Id. at ¶ 19. Plaintiff also alleges that RISO stated that it would not sell Plaintiff RISO digital duplicators unless Plaintiff agreed to purchase exclusively RISO supplies for use in RISO equipment, and not use any competitive supplies. Compl. at ¶ 19. Plaintiff further alleges that after termination as a RISO dealer, Defendant prohibited Plaintiff from purchasing RISO parts to service and maintain duplicators it had previously sold unless it also continued to purchase only RISO supplies, and from using any competitive supplies, as provided in paragraph 5(d) of the new Dealer Agreement. Id.

---

[2] This was extended to May 31, 2013.

Since September 20, 2012, the parties have not reached agreement on the terms of a new Dealer Agreement. Id. at ¶ 20. Plaintiff has told Defendant that it will not agree to the terms of the 2012 Dealer Agreement as written and Defendant has maintained its position that if Plaintiff did not agree to the new Dealer Agreement, Plaintiff will cease being an authorized dealer after March 31, 2013. Id. at ¶¶ 20, 22.

Any additional allegations are incorporated into the discussion below.

STANDARDS

On a motion to dismiss, the court must review the sufficiency of the complaint. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Am. Family Ass'n, Inc. v. City & County of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002). However, the court need not accept conclusory allegations as truthful. Holden v. Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992).

A motion to dismiss under Rule 12(b)(6) will be granted if plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" Id. (citations and footnote omitted).

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

Defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(internal quotation omitted). Additionally, "only a complaint that states a plausible claim for

relief survives a motion to dismiss." Id. The complaint must contain "well-pleaded facts" which

"permit the court to infer more than the mere possibility of misconduct." Id. at 679.

DISCUSSION

I. The Antitrust Claim

   A. Description of the Claim

Plaintiff's First Claim for Relief is for "illegal tying" and is brought under section 1 of the

Sherman Act, 15 U.S.C. § 1, and section 3 of the Clayton Act, 15 U.S.C. § 14.[3] Plaintiff alleges

that digital duplicators and supplies used in digital duplicators constitute two separate and

distinct products. Id. at ¶ 38. By requiring its authorized dealers to sell only RISO supplies (and

requiring them not to sell supplies that compete with RISO supplies) in order to sell digital

duplicators under the explicit terms of its Dealer Agreement, Plaintiff alleges that Defendant has

illegally tied the purchase of RISO supplies to the purchase of RISO digital duplicators in

violation of the antitrust laws. Id. at ¶ 39. Plaintiff contends that Defendant possesses sufficient

economic power in the digital duplicator market to coerce its authorized dealers to agree not to

sell any competing non-RISO supplies and to sell only RISO supplies for use in conjunction with

RISO digital duplicators. Id. at ¶ 40. Given that Defendant "has made clear" that Plaintiff will

no longer be an authorized dealer after March 31, 2013 if it does not agree to refrain from selling

competing non-RISO supplies under the terms of its Dealer Agreement, Defendant is attempting

---

    [3] The elements for establishing a tying violation under these two statutes "are virtually
the same" and the court treats them alike in its analysis. Airweld, Inc. v. Airco, Inc., 742 F.2d
1184, 1189 n.2 (9th Cir. 1984).

to coerce Plaintiff to purchase only RISO supplies.  Id. at ¶ 41.

Plaintiff alleges that by tying RISO supplies to RISO digital duplicators in this way, Defendant has substantially foreclosed competing digital duplicator suppliers from the largest channel of distribution, and competing manufacturers of these supplies find it exceptionally difficult to reach end-user consumers.  Id. at ¶ 42.  And, Defendant's conduct results in Defendant charging supra-competitive prices for its supplies.  Id. at ¶ 43.  Defendant's conduct has unreasonably restrained competition in the relevant market and has caused Plaintiff, other RISO authorized dealers, and consumers of RISO digital duplicators to suffer antitrust injuries by being coerced into purchasing products they don't want or need, being forced to purchase RISO supplies at a supra-competitive price, and having their choice of available products artificially limited.  Id.

Defendant moves to dismiss the antitrust claim because it is barred by the statute of limitations.  Alternatively, Defendant argues that the claim fails to state a claim in a number of respects.

B.  Statute of Limitations

Antitrust claims are subject to a four-year statute of limitations.  15 U.S.C. § 15b; Airweld, 742 F.2d at 1189.  A cause of action under section 15b "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  Because the Complaint in this case was filed on January 29, 2013, the limitations period began on January 29, 2009.

It is clear from the Complaint that the origin of the antitrust claim is in paragraph 3 of the

Dealer Agreement, quoted above.[4]  What is less clear is whether Plaintiff bases the claim on the current enforcement of that provision in the Dealer Agreements or on the threat of losing its authorized dealer status for refusing to sign the 2012 Dealer Agreement.

To the extent the claim is based on the actual enforcement of paragraph 3 of the 2007 Dealer Agreement, I agree with Defendant that such a claim accrued on April 1, 2007, the effective date of that agreement.  The Complaint alleges that the 2007 Dealer Agreement expired in March 2010 (other than its brief ninety-day resurrection in 2011 as part of the APA).  The 2012 Dealer Agreement has never been executed.  There is, therefore, no operative express agreement under which Defendant is allegedly enforcing the illegal provision in paragraph 3(a).  Moreover, Plaintiff alleges in the Complaint that although there is no express Dealer Agreement in place, its status as an authorized dealer has continued.  Plaintiff does not allege that Defendant has continued to enforce paragraph 3(a) during this time.

Any enforcement of the allegedly illegal tying provision in paragraph 3(a) began with the 2007 Dealer Agreement.[5]  Accordingly, any antitrust cause of action based on the current enforcement of paragraph 3(a) accrued with the effective date of the 2007 Dealer Agreement or April 1, 2007.  Because this claim was filed more than four years after that date, it is time barred.  Eichman v. Fotomat Corp., 880 F.2d 149, 160 (9th Cir. 1989) (statute of limitations barred tying claim when lease contract containing alleged illegal tying provision was entered into outside the

---

[4]  Paragraph 3(a) is the same in the 2007 Dealer Agreement and the 2012 Dealer Agreement.  Exs. A-1, A-3 to Hawkes Decl.

[5]  While the parties' relationship predates the 2007 Dealer Agreement, the Complaint recites terms of only the 2007 Dealer Agreement and Defendant bases its motion and argument on that agreement.

9 - OPINION & ORDER

limitations period); Aurora Enters., Inc. v. Nat'l Broad. Co., 688 F.2d 689, 693 (9th Cir. 1982)

(statute of limitations barred plaintiff's claim because the contract containing the alleged illegal

tying provision was entered into more than four years before the complaint was filed); Irving v.

Lennar Corp., No. CIV S–12–290 KJM EFB, 2013 WL 1308712, at *15 (E.D. Cal. Apr. 1, 2013)

("When a plaintiff alleges that an agreement is an illegal tying agreement, he must bring suit

within four years after the agreement was executed, as a general rule.").

Additionally, although continuing violations may restart the antitrust statute of

limitations, there must be a "new and independent act that is not merely a reaffirmation of a

previous act," and "it must inflict new and accumulating injury on the plaintiff." Pace Indus., Inc.

v. Three Phoenix Co., 813 F.2d 234, 237, 238 (9th Cir. 1987).  Here, any sales of digital

duplicators and supplies pursuant to paragraph 3(a) of the 2007 Dealer Agreement and occurring

during the limitations period do not amount to continuing violations because performance of an

alleged illegal contractual tie-in provision does not satisfy the continuing violation requirements.

E.g., Eichman, 880 F.2d at 160 (rejecting plaintiff's argument that each payment under the

allegedly illegal lease contract was a new injury for the purposes of the statute of limitations);

Aurora Enters., 688 F.2d at 694 (continued receipts by the defendant from the contract did not

amount to an overt act capable of restarting the statute of limitations); see also Varner v. Peterson

Farms, 371 F.3d 1011, 1019 (8th Cir. 2004) ("[p]erformance of the alleged anticompetitive

contracts during the limitations period is not sufficient to restart the period"; claim barred by

statute of limitations when contract entered into outside of limitations period ).

Finally, I reject Plaintiff's argument that the claim was not actionable until sometime in

the spring of 2012 when non-RISO supplies allegedly first became available.  Plaintiff contends

that the presence of the contractual tying provision in paragraph 3(a) alone did not start the statute of limitations because no alternative supplies were available to authorized dealers until March or April of 2012. Plaintiff makes no such allegations in the Complaint and thus, on the face of the Complaint, any claim based on enforcement of the allegedly illegal tying provision in paragraph 3(a) of the 2007 Dealer Agreement accrued on April 1, 2007. Also, Plaintiff's argument is inconsistent with allegations in the Complaint that as early as 2011 when the APA was being negotiated, Plaintiff objected to the illegal tying provision. Compl. at ¶¶ 12-14. Moreover, as indicated above, the Complaint fails to allege that Defendant enforced paragraph 3(a) after the March 2010 expiration of the 2007 Dealer Agreement (other than the ninety days in 2011 it became part of the APA). Therefore, the Complaint does not support any claim accruing in the spring of 2012 based on enforcement of paragraph 3(a). To the extent the antitrust claim is based on the enforcement of paragraph 3(a) pursuant to the contractual relationship commencing April 1, 2007 when the 2007 Dealer Agreement became effective, it is time barred and is dismissed with prejudice.

The Complaint also suggests, however, that the alleged injurious act is not the enforcement of paragraph 3(a) over the years, but is the present threat to end Plaintiff's authorized dealer status as a consequence for Plaintiff's refusal to sign the 2012 Dealer Agreement. Defendant gave Plaintiff the proposed 2012 Dealer Agreement on September 11, 2012. Compl. at ¶ 17. In the September 20, 2012 Letter sent by Defendant to Plaintiff, Defendant told Plaintiff that Defendant would interpret Plaintiff's failure to accept the proposed 2012 Dealer Agreement by December 31, 2012, as a determination by Plaintiff that Plaintiff no longer wished to remain an authorized dealer and in that event, the September 20, 2012 Letter

11 - OPINION & ORDER

was notice that Defendant would not renew Plaintiff as an authorized dealer and that Plaintiff's

status as an authorized dealer would expire on March 31, 2012.  Ex. A-4 to Mar. 27, 2013

Hawkes Decl.  Defendant also told Plaintiff that it had reason to believe that Plaintiff had sold

non-RISO supplies for Defendant's duplicator machines.  Id.  Defendant then stated that if

Plaintiff entered into the 2012 Dealer Agreement, Defendant would consider such an act as an

acknowledgment by Plaintiff of its agreement to abide by paragraph 3(a) of the agreement going

forward and Defendant would forgive any such prior sales of non-RISO supplies.  Id.

As characterized by Plaintiff in the Complaint, the September 20, 2012 Letter is an

attempt by Defendant to coerce Plaintiff into purchasing only RISO supplies.  Compl. at ¶ 42.

To the extent an antitrust tying claim can be based on the September 20, 2012 Letter, it appears

that such a claim is timely because it accrued on September 20, 2012.

However, Defendant argues that the September 20, 2012 Letter creates no such claim

because it is unilateral conduct not prohibited by section 1 of the Sherman Act.  Section 1

declares illegal "[e]very contract, combination . . . , or conspiracy, in restraint of trade or

commerce among the several States[.]"  15 U.S.C. § 1.  "The phrase 'contract, combination, or

conspiracy' has been interpreted to require concerted action of more than a single entity."  The

Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1152 (9th Cir. 1988).

> Unilateral conduct by a single firm, even if it "appears to restrain trade
> unreasonably," is not unlawful under section 1 of the Sherman Act.  FN1.
>
> > FN1.  Unilateral conduct may be unlawful under section 2 of the
> > Sherman Act, . . . , if the conduct threatens monopolization.  . . .
> > [P]urely unilateral conduct is illegal only under § 2 and not under §
> > 1.  Monopolization without conspiracy is unlawful under § 2, but
> > restraint of trade without a conspiracy or combination is not
> > unlawful under § 1.

Id. at 1152 & n.1 (citations and internal quotation marks omitted).

Based on the requirements of section 1, the Supreme Court held in 1919 that a manufacturer's unilateral refusal to deal with distributors did not violate antitrust laws. United States v. Colgate, 250 U.S. 300, 307 (1919); see also The Jeanery, 849 F.2d at 1153 ("under the Colgate doctrine, a manufacturer is free to announce resale prices and refuse to deal with dealers who sell below the announced price").

In a case from this Court, and relied upon by Defendant, the defendant eyewear manufacturer[6] imposed certain restrictions on its distributors including one prohibiting them from selling to high-volume distributors rather than to optometrists, ophthalmologists, and retail optical stores. Glacier Optical, Inc. v. Optique Du Monde, Ltd., 816 F. Supp. 646 (D. Or. 1993), aff'd, 1995 WL 21565 (9th Cir. 1994). Typically, the high-volume distributor would "undersell" their competitors causing concern to some of the defendant's other distributors. Id. at 648. The defendant was also concerned that the high-volume distributors, whose interest was in "turnover volume," operated inconsistently with the defendant's philosophy of promoting brand loyalty and long-term satisfaction. Id.

The plaintiff, a distributor who had been selling to high volume-distributors such as Wal-Mart and Costco, objected to the defendant's attempt to enter into a written distribution agreement incorporating the defendant's policy. As a result, the defendant terminated the plaintiff's distributorship primarily because of the plaintiff's refusal to enter into the new agreement with the customer limitations imposed by the defendant. The plaintiff then brought

---

[6] The defendant actually held the license from the manufacturer, but the court treated the defendant as the manufacturer itself.

antitrust and other claims against the defendant, contending that the defendant unlawfully restrained trade in violation of section 1 of the Sherman Act.  Id. at 649-50.

Judge Frye granted the defendant's motion for summary judgment on the antitrust claim because she found that "[t]here was no evidence that [the defendant] acted anything but unilaterally."  Id. at 652.  She explained that it "was not a violation of antitrust laws for [the defendant] to terminate [the plaintiff] because [the plaintiff] refused to agree to the customer restrictions in the written agreement proposed by [the defendant] if [the defendant] acted unilaterally in terminating [the plaintiff]."  Id.; see also id. at 650 (discussing concerted action requirement of section 1 and stating "[u]nilateral action by the manufacturer is not proscribed").

Defendant argues that just as in Glacier Optical, its action here in terminating Plaintiff's status as an authorized dealer is, according to the allegations in the Complaint, solely unilateral action by Defendant.  There are, for example, no allegations that Defendant acted with any other entity or person; thus, there are no allegations of concerted action or collusion.

In response, Plaintiff does not deny the absence of concerted action allegations but argues that the Colgate doctrine applies only when a manufacturer/supplier refuses to sell for a lawful reason.  In other words, if the manufacturer/seller refuses to sell to a distributor for an unlawful reason, the refusal to sell alone is actionable under section 1.  See Pl.'s Resp. to Def.'s Mot. to Dismiss at 1.  Plaintiff cites no cases in support of this argument.  Id.

While Glacier Optical was concerned with resale price maintenance and not tying, either type of conduct may be prohibited under antitrust law.  Nonetheless, Judge Frye never discussed whether the object of the agreement proposed by the defendant and which the plaintiff refused to sign, triggering the plaintiff's termination as a distributor for the defendant, was or was not illegal

14 - OPINION & ORDER

under section 1.  Rather, the claim failed solely because defendant acted unilaterally.  The

unlawfulness of the terms of the agreement was a non-issue.  Plaintiff's attempt to distinguish

Glacier Optical is unavailing because the case does not suggest that the price maintenance

purpose of the agreement, as opposed to an agreement whose purpose was unlawful tying, was

relevant to the outcome.

Other cases support Defendant's argument.  For example, in a Tenth Circuit case, the

plaintiff alleged that the defendant engaged in an illegal tying practice by conditioning the sale of

blown wool insulation to the sale of batts insulation.  Black Gold, Ltd. v. Rockwoll Indus., Inc.,

729 F.2d 676, 678-79 (10th Cir.), supplemented, 732 F.2d 779 (10th Cir. 1984).  The defendant

then terminated its sales of blown wool to the plaintiff.  Id. at 679.  The plaintiff brought various

claims against the defendant including an illegal tying claim and a claim that the defendant's

refusal to deal with the plaintiff "was in furtherance of the tying arrangement and amounted to a

conspiracy in restraint of trade in violation of section 1 of the Sherman Act."  Id.

In analyzing the refusal to deal claim, the court explained that under Colgate, a unilateral

refusal to deal does not violate section 1 of the Sherman Act.  Id. at 685.  The court then noted

that cases after Colgate suggested that nonetheless, a unilateral refusal to deal could be actionable

under certain circumstances:

> a plaintiff who contends a seller has unlawfully used a refusal to deal as a means
> of enforcing an anticompetitive practice (such as tying or price fixing) may
> establish the requisite combination or conspiracy in either of two ways:  [1] by
> showing that he himself unwillingly complied with the practice, or [2] by showing
> that although he refused to acquiesce, other buyers agreed to the arrangement
> under threat of termination.

Id. at 686 (emphasis added, discussing Colgate, 250 U.S. at 307, citing United States v. Parke,

15 - OPINION & ORDER

Davis & Co., 362 U.S. 29, 45 (1960)).  Black Gold indicates that the Colgate doctrine, as

subsequently refined by the Supreme Court, may apply when the alleged refusal to deal is in

furtherance of an illegal tying arrangement but only when certain other facts are present.

Similarly, cases recognize that the coercive aspect of an illegal tying arrangement is not

found when the distributor plaintiff refuses to acquiesce in the proposed tying arrangement.  For

example, in an Eighth Circuit case, the plaintiff alleged that the defendant tied the sale of one

product to the purchase of other products the plaintiff did not desire.  Famous Brands, Inc. v.

David Sherman Corp., 814 F.2d 517, 519-20, 522 (8th Cir. 1987).  The plaintiff refused to

purchase the tied product and the defendant began distributing its products through someone else.

On the illegal tying claim, the Famous Brands court discussed that the Supreme Court's

1984 case of Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984), a case also

discussed by Judge Frye in Glacier Optical, had reaffirmed the doctrine of Colgate and made

clear that the plaintiff in a section 1 Sherman Act claim must show a contract, combination, or

conspiracy, and that under Monsanto, a manufacturer "'has a right to deal, or refuse to deal, with

whomever it likes, as long as it does so independently.'"  Id. at 523 (quoting Monsanto, 465 U.S.

at 761).

The Famous Brands court then dismissed the antitrust claim because the plaintiff itself

refused to purchase the tied product from the defendant and thus, no concert of action existed

between the two of them, and because the plaintiff could not establish that the defendant coerced

third parties into acquiescing to the defendant's demands.  Id. at 523-24.  Citing a Second Circuit

decision, the Famous Brands court explained that "'[a]ctual coercion by the seller that in fact

forces the buyer to purchase the tied product is an indispensable element of a tying violation.'"

Id. at 523 (quoting Unijax, Inc. v. Champion Int'l, Inc., 683 F.2d 678, 685 (2d Cir. 1982)).  Thus, because the section 1 claim required evidence of concerted conduct, the court dismissed the claim in the absence of the plaintiff's refusal to purchase the tied conduct or evidence that third parties had been coerced into doing so.

Additionally, the Famous Brands court explained that to the extent the tying claim was based on section 3 of the Clayton Act, it also failed.  Id. at 524.  Although section 3 of the Clayton Act "proscribes sales made on the condition that the buyer not use or deal in competing products[,]" the court explained that "[j]ust as in section 1 of the Sherman Act, this provision requires proof that a buyer acquiesced in such an arrangement."  Id. Thus, the tying claim could not succeed.

The Northern District of California addressed the same situation in a 2005 case.  There, the plaintiff alleged that the defendant terminated the contract it had with the plaintiff because the plaintiff refused to comply with the defendant's allegedly illegal tying policy.  Strawflower Elecs., Inc. v. Radioshack Corp., No. C-05-0747 MMC, 2005 WL 2290314, at *8 (N.D. Cal. Sept. 20, 2005).  The court dismissed the claim on a motion to dismiss because the plaintiff failed to allege that it had actually been coerced into buying the tied product.

The court explained:

> The Ninth Circuit has stated that an "essential" element of a tying claim is "proof that the seller coerced a buyer to purchase the tied product."  See Paladin Associates v. Montana Power Co., 328 F.3d [1145] at 1159 [9th Cir. 2003] (emphasis in original).  In Paladin, the Ninth Circuit further noted that "mere sales pressure" does not constitute evidence of the requisite coercion.  See id. at 1160.  Because Paladin did not involve a plaintiff who refused to purchase the tied product, the Ninth Circuit did not address whether evidence of acts that could be described as attempted coercion were sufficient to state a tying claim.  Other circuits, however, have held that no tying claim can be stated where the plaintiff

refused to purchase the tied product.  See, e.g., Famous Brands, Inc. v. David
Sherman Corp., 814 F.2d 517, 523 (8th Cir. 1987) (citing Unijax, Inc. v.
Champion Int'l, Inc., 683 F.2d 678, 685 (2nd Cir. 1982) ("Actual coercion by the
seller that in fact forces the buyer to purchase the tied product is an indispensible
element of a tying violation.")).  Additionally, a leading antitrust treatise concurs
that "an express tying contract that is proposed to buyers but rejected by them
does not constitute a tie" and that "the mere termination or rejection of a dealer or
customer who refuses to comply with a tie" is not unlawful tying.  See Areeda,
Elhauge, and Hovenkamp, Antitrust Law, §§ 1753a, 1753f (2d ed. 2004).

Id.

    As explained in the cited treatise, there are three relevant scenarios involving a

unilaterally proposed tie:  (1) the defendant demands a tie that the buyer rejects completely; (2)

the defendant insists on the buyer's agreement to buy the tied product and refuses to deal with the

buyer who refuses to agree or does not comply; and (3) the buyer may explain it will not comply

with an announced condition that it take the tied product.  Phillip E. Areeda & Herbert

Hovenkamp, Antitrust Law, ¶1753f (3d ed. 2011).  In any of these situations, the "buyers are thus

declining to buy the tied product and are likely to be denied the tying product."  Id.  And "the

defendant may simply not sell the tying product to buyers who do not take its tied product."  Id.

    Regardless of which scenario occurs, no section 1 Sherman Act claim nor section 3

Clayton Act claim is stated:

        In all these cases, there is no conditioned sale of the tying product.  The
        defendant's refusal to sell the products separately does thus not itself come within
        Clayton Act §3.  And absent an express tying contract, the nonpurchase of the tied
        product means that nothing - not even earlier purchases of the tying product -
        created any Sherman Act § 1 agreement.  Thus, the mere termination or rejection
        of a dealer or customer who refuses to comply with a tie is neither a tying
        agreement nor a conditioned sale.

Id. (footnotes omitted).

    Without an operative agreement under which paragraph 3(a) of the Dealer Agreement is

being enforced, there is no actionable tying contract.  Accordingly, the threat of terminating

Plaintiff's dealership status is unilateral conduct not subject to section 1 of the Sherman Act or

section 3 of the Clayton Act without allegations that other buyers agreed to the tying arrangement

under threat of termination.  There are no such allegations in the Complaint.  Although Plaintiff

alleges that on information and belief, Defendant requires all of its authorized dealers to abide by

paragraph (3) of the Dealer Agreement, Compl. at ¶ 31, and that Defendant possesses sufficient

economic power to coerce its dealers to sell only RISO supplies, Compl. at ¶ 40, there is no

allegation that other dealers have been coerced into entering such agreements under threat of

termination by Defendant.[7]

The Complaint fails to state an antitrust tying claim.  Any claim based on the expired

2007 Dealer Agreement provisions is dismissed with prejudice because it is time barred and

incapable of being resurrected.  The claim based on the September 20, 2012 threat of termination

for failing to agree to the 2012 Dealer Agreement could in theory be amended to state a claim.[8]

---

[7]  Moreover, given Plaintiff's representation that the antitrust claim was not ripe until spring of 2012 when suitable alternative supplies first became available, any allegations of third parties being coerced under threat of termination would have to relate to that time period or later.

[8]  While not clearly alleged in the Complaint, Plaintiff contends that it alleges the existence of a separate tying agreement related to Defendant's sale of parts to Plaintiff after Plaintiff's termination as a dealer.  Compl. at ¶ 19.  This allegation refers to statements Defendant allegedly made in the September 20, 2012 letter regarding paragraph 5(d) of the 2012 Dealer Agreement.  I find no such reference to paragraph 5(d) in that letter, or to any other subsection of paragraph 5 of the 2012 Dealer Agreement.  Ex. A-4 to Mar. 27, 2013 Hawkes Decl.  Putting that issue aside, I note that this allegation does not appear in the section of the Complaint reciting the allegations in support of the antitrust claim, Compl. at ¶¶ 24-36, or in the allegations recited in support of the First Claim for Relief for Illegal Tying.  Id. at ¶¶ 37-47.  Although Plaintiff attempted to explain this claim in its response to the motion to dismiss, at this point, I agree with Defendant that the claim is so vaguely asserted that it cannot stand as pleaded.  Furthermore, even if it were more clearly stated, it would be dismissed for the same reasons as the primary tying claim discussed above.

19 - OPINION & ORDER

Therefore, that claim is dismissed without prejudice.[9]

C.  Failure to State a Claim

Although I dismiss the antitrust claim for the reasons stated above, I address Defendant's

other arguments in the event Plaintiff amends its Complaint.  Defendant contends that the

antitrust claim fails to state a claim because Plaintiff does not adequately plead the required

elements of relevant market and market power, and does not adequately identify the tied and

tying products.  I agree with Defendant regarding the market power argument, but otherwise find

that the Complaint sufficiently states the relevant market and describes the tied and tying

products.

> A plaintiff must prove three elements to prevail on an illegal tying claim:
> (1) that there exist two distinct products or services in different markets whose
> sales are tied together; (2) that the seller possesses appreciable economic power in
> the tying product market sufficient to coerce acceptance of the tied product; and
> (3) that the tying arrangement affects a "not insubstantial volume of commerce" in
> the tied product market.

Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1159 (9th Cir. 2003).  The "plaintiff

must allege both that a 'relevant market' exists and that the defendant has power within that

market."  Newcal Indus., Inc. v. IKON Office Solutions, 513 F.3d 1038, 1044 (9th Cir. 2008).

Newcal makes clear that "[t]here is no requirement that these elements of the antitrust

_____

[9]  I do not separately address Plaintiff's argument regarding its requested injunctive relief
other than to note that because the doctrine of laches is coextensive with the statute of
limitations, the same time period will apply, regardless of the nature of the relief.  Aurora Enters.,
688 F.2d at 694 ("four-year statute of limitations . . . furnishes a guideline for computation of the
laches period in antitrust suits) (citing Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp., 518
F.2d 913, 929 (9th Cir. 1975) ("the four-year limitation period in Clayton Act § 4B, 15 U.S.C. §
15b, furnishes a guideline for computation of the laches period"), disapproved of on other
grounds, Cal. v. Am. Stores Co., 495 U.S. 271 (1990)).

claim be pled with specificity." Id. at 1045.  Moreover, "since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." Id.

The relevant market must be a product market and must "encompass the product at issue as well as all economic substitutes for the product." Id.  The "outer boundaries" of the product market are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Id. (internal quotation marks omitted)

Plaintiff alleges that "the relevant product market consists of digital duplicators, and the relevant geographic market consists of the United States. . . . On information and belief, RISO has approximately a 65% share of the relevant market."  Compl. at ¶ 24.  Further, Plaintiff alleges that digital duplicators create an image to be copied once on a "master," then use that master for copies which are created by pressing ink through microscopic holes in the master using a thermal imaging process.  Id. at ¶ 26.  Fewer supplies are required than in other reproduction techniques, making the cost per copy lower.  Id. at ¶¶ 26-28.  For that reason, digital duplicators are often used by organizations that need to create large volumes of documents for the lowest possible cost, including school districts, government offices, healthcare organizations, and non-profit organizations.  Id. at ¶¶ 26-30.

Defendant argues that Plaintiff's relevant market allegations fail to state a claim because they do not address the interchangeability or cross-elasticity of demand between digital duplicators and other copying devices identified in the Complaint.  See Compl. at ¶ 25 (alleging that digital duplicators are a separate and distinguishable product market from copiers, printers, or other multifunctional printing products).  Defendant argues that Plaintiff must allege facts

sufficient to establish how or why duplicators do not compete with other document imaging

devices alleged in the Complaint which are produced and sold by companies such as Canon,

Ricoh, and Xerox.

While conclusory allegations regarding interchangeability are insufficient to state a claim,

see Tanaka v. University of Southern California, 252 F.3d 1059, 1063 (9th Cir. 2001) (allegation

that the "'UCLA women's soccer program' is 'unique' and hence 'not interchangeable with any

other program in Los Angeles'" was insufficient to state a claim), it is not fatal for the Complaint

to omit express references to "reasonably interchangeable substitutes" or "cross-elasticity." Id.

(noting that defining a relevant market in terms of reasonable interchangeability "encompasses

notions of . . . product use, quality, and description") (internal quotation marks omitted). Thus,

factual allegations regarding the distinct nature of the relevant product market, the relevant

product's difference from other products, and the relevant product's consumer base are enough to

state the relevant market portion of a tying claim under section 1 of the Sherman Act. E.g.,

McCabe Hamilton & Renny Co. v. Matson Terminals, Inc., Civil No. 08-00080 JMS/BMK, 2008

WL 2437739, at *7 (D. Haw. June 17, 2008) (complaint would have been sufficient if it

contained factual allegations regarding distinct nature of the product, the product's difference

from other products, and the consumer base).

Here, Plaintiff's allegations regarding the unique features of digital duplicators include

how they create a copy, the different supplies they use, and the ability to create large numbers of

copies for a low cost and at high speed. This is adequate to show the distinct nature of digital

duplicators and how they are different from other products. Plaintiff also puts forth allegations

as to the typical consumer of digital duplicators. These alleged facts adequately state the relevant

market.

As to market power, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." Ill. Tool Works, Inc. v. Indep. Ink., 547 U.S. 28, 46 (2006).  "Market power is the ability to raise prices above those that would be charged in a competitive market." NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 109 n.38 (1984).

In a 2008 case, the plaintiff alleged that the defendant Equilon, doing business as Shell Oil Products, required the plaintiff to use its credit-card processing services (the tied product) when the plaintiff obtained a retail gasoline franchise (the tying product).  Rick–Mik Enters., Inc. v. Equilon Enters., LLC, 532 F.3d 963, 972 (9th Cir. 2008).  The plaintiff alleged specific facts as to Equilon's power in the retail gasoline market.  But, the plaintiff failed to adequately allege market power in the relevant market for the tying product—the retail gasoline franchise market—because, the court explained, the complaint failed to include such relevant factual allegations as "what percentage of gasoline franchises are Equilon's (Shell/Texaco) as compared to other franchises[,]  . . . the percentage of gasoline retail sales that are made through non-franchise outlets[,] . . . the amount of power or control that Equilon has over prospective franchisees[,] . . . [or] the relative difficulty of a franchisee to switch franchise brands."  Id.

Relying on Rick-Mik, the Eastern District of California recently dismissed an illegal tying claim on a Rule 12(b)(6) motion for failure to state a claim when the plaintiffs failed to sufficiently allege the defendant's market power.  Cherrone v. Florsheim Dev., No. CIV. 2:12–02069 WBS CKD, 2013 WL 772526, at*2-3  (E.D. Cal. Feb. 28 2013).  The plaintiffs contended that the defendant illegally tied home sales to financing.  The court noted that although

the plaintiffs alleged that the defendant had built "literally thousands" of homes between a certain period of time, the complaint "lacks any factual allegations as to the percentage of homes in the relevant market built by Florsheim compared to other builders, the percentage of home sales by non-Florsheim developers in the relevant market, or the relative difficulty of obtaining a comparable home in the relevant market" Id. at *3.  As a result, the court concluded that under Twombly and Iqbal, the complaint failed to state an illegal tying arrangement because it did not include factual allegations of market power in the relevant market.

Defendant argues that the Complaint lacks factual allegations such as those noted in the cited cases to support Plaintiff's "65% share" allegation.  Defendant argues that to adequately allege market power, Plaintiff must allege that there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run.

I agree with Defendant.  Newcal Industries holds that the "[t]he 'relevant market' and 'market power' requirements apply identically under [section 1 and section 2] of the Act[.]" 513 F.3d at 1044 n.3.  Thus, Plaintiff must plead allegations regarding barriers to entry and the lack of ability by competitors to increase their share of the market.  See Dominick v. Collectors Universe, Inc., No. 2:12-CV-04782-ODW, 2012 WL 4513548, at *6-7 (C.D. Cal. Oct. 1, 2012) (describing elements of both the direct evidence and circumstantial evidence tests used to establish market power).

While the Complaint alleges that defendant possesses 65% of the market, exerts sufficient power in the digital duplicator market to coerce its dealers to refrain from selling competitors' supplies, and charges supra-competitive prices for its supplies, there are insufficient allegations establishing barriers to entry and that defendant's conduct precludes competitors from increasing

24 - OPINION & ORDER

their output.  Neither can these facts be inferred from the allegations that are in the Complaint.

As a result, the Complaint fails to adequately allege market power.

Finally, although I agree with Defendant that the Complaint can be confusing regarding

the tied and tying products, I do not think the confusion is fatal to the claim.  A fair reading of the

entire Complaint establishes that Plaintiff alleges that the tying product is RISO digital

duplicators and the tied product is RISO digital duplicator supplies.

II.  The State Law Claims

A.  Intentional Interference with Economic Relations (IIER)

To state a claim for IIER Plaintiff must allege

(1) the existence of a professional or business relationship (which could include,
e.g., a contract or a prospective economic advantage), (2) intentional interference
with that relationship, (3) by a third party, (4) accomplished through improper
means or for an improper purpose, (5) a causal effect between the interference and
damage to the economic relationship, and (6) damages.

Mannex Corp. v. Bruns, 250 Or. App. 50, 53, 279 P.3d 278, 281 (2012) (citing McGanty v.

Staudenraus, 321 Or. 532, 535, 901 P.3d 841, 844 (1995)).

As to improper means or purpose, Plaintiff alleges that Defendant has used the improper

means of "threatening to terminate Witt Company's authorized dealer status unless Witt

Company agrees to all the terms and conditions of RISO's Dealer Agreement as written,

including not to sell any non-RISO equipment, parts, or supplies that compete with RISO's

products, in violation of federal antitrust laws."  Compl. at ¶ 54.

Defendant moves to dismiss the claim because the improper means allegation is

inseparably tied to the antitrust claim which Defendant argues must fail.  See Willamette Dental

Group, P.C. v. Or. Dental Serv. Corp., 130 Or. App. 487, 498-99, 882 P.2d 637, 644 (1995)

(competitive conduct permitted under the antitrust laws cannot be punished as tortious interference). Plaintiff concedes this argument, Pl.'s Resp. at 16, and thus, because the IIER claim is based on the improper means of antitrust violations and the antitrust claim is dismissed, the IIER is also dismissed.

   B.  Breach of Contract/Breach of the Duty of Good Faith & Fair Dealing

   These two claims are based on the APA.  Plaintiff alleges that the APA "specifically provides" that Defendant will supply Plaintiff with its products until April 1, 2014.  Compl. ¶ 60. Plaintiff alleges that Defendant breached the APA by terminating Plaintiff's authorized dealer status and refusing to provide Plaintiff with any of Defendant's products after March 31, 2013, due to Plaintiff's refusal to execute the 2012 Dealer Agreement.  Id.  Plaintiff also alleges that Defendant breached the duty of good faith and fair dealing because the APA expressed Defendant's intent to continue a business relationship with Plaintiff for three years.  Id. at ¶ 67-68.  Plaintiff alleges that Defendant has prevented Plaintiff from receiving the benefits of the APA by inhibiting Plaintiff's ability to properly serve its customers and participate in the Annual Bonus Program. Id. at ¶ 69.

   Defendant moves to dismiss these claims for failure to state a claim, lack of personal jurisdiction, and improper venue.

   1.  Failure to State a Claim

   Defendant argues that the breach of contract claim must be dismissed because the APA does not require Defendant to sell its products to Plaintiff absent the execution of a Dealer Agreement.  Plaintiff initially argues that whether the APA requires Defendant to sell its products to Plaintiff is a "factual matter" that should be resolved through summary judgment or at trial.  I

disagree.  Contract interpretation is a question of law for the court.  <u>Wall Data, Inc. v. Los Angeles Cnty. Sheriff's Dep't</u>, 447 F.3d 769, 786 (9th Cir. 2006); <u>Squier Assocs,, Inc. v. Secor Invs., LLC</u>, 196 Or. App. 617, 522, 103 P.3d 1129, 1133 (2004).

Next, Plaintiff appears to concede that the express language of the APA does not create an obligation for Defendant to sell its products to Plaintiff for three years beginning April 2, 2011.  Pl.'s Resp. Mem. at 18 (arguing that court can imply contractual provision necessary to effectuate contract's purpose).  The claim is dismissed to the extent Plaintiff alleges that the APA contains express language requiring Defendant to continue to supply Plaintiff with products until April 2014.

Plaintiff argues that the obligation should be implied based on sections 1.11 and 2.8 of the APA.  <u>Id.</u> (citing Compl. at ¶ 11).  "The law will imply a provision in a contract that is necessary to carry out the purpose for which the contract was made."  <u>Morrow v. Red Shield Ins. Co.</u>, 212 Or. App. 653, 661, 159 P.3d 384, 388 (2007) (citing <u>Card v. Stirnweis</u>, 232 Or. 123, 134, 374 P.2d 472 (1962)).  "Whether a provision is implied by necessity is a legal question that we decide as a matter of contract construction."  <u>Id.</u> (citing <u>Pinnacle Packing Co. v. Herbert</u>, 157 Or. 96, 105–06, 70 P.2d 31 (1937)).  "Although a court may declare what is implicit in the terms of a contract, it may not create an entirely new obligation under the guise of 'necessary implication.'"  <u>Id.</u>

Section 1.11 of the APA addresses the "Deferred Purchase Price."  Ex. A-2 to Mar. 27, 2013 Hawkes Decl.  The total price to be paid by Plaintiff to Defendant for the purchase of the assets subject to the APA was $700,000.  <u>Id.</u> at §§ 1.10, 1.11.  $200,000 was to be paid at closing.  <u>Id.</u> at § 1.10.  $500,000 was the deferred purchase price, to be paid in thirty-six equal

27 - OPINION & ORDER

monthly payments of $13,888.89 per month, due the first of each month beginning May 1, 2011, one month after the April 1, 2011 closing.  Id. at § 1.11.

Section 1.11 also contemplated a reduction in the deferred purchase price for credits earned by Plaintiff under the "Annual Bonus Program," detailed in section 2.8 of the APA.  Id. Under the Annual Bonus Program, Plaintiff could earn credits based on sales of Defendant's products and services during the first thirty-six months following closing.  Id. at § 2.8.  The details of the amount of credit and how it is earned are explained in the five subsections of section 2.8 but there is no dispute that under the APA, Plaintiff could earn credit for selling Defendant's products.

Plaintiff alleges and argues that sections 1.11 and 2.8 show the parties' intent to continue their business relationship and their intent for Defendant to continue to provide its products to Plaintiff until April 1, 2014, three years after the execution of the APA.  Compl. at ¶ 11. Defendant argues that these sections reflect only the three-year promissory note to pay for the purchase of the assets and the corresponding credit program that allowed Plaintiff to offset the payments on that note.

Although I agree with Plaintiff that the APA suggests that the parties contemplated an ongoing business relationship where Plaintiff would continue to buy products from Defendant so Plaintiff could sell them in the California and Arizona counties to which the APA applied, the actual sale of those products by Defendant to Plaintiff was expressly governed by a Dealer Agreement which Plaintiff refuses to sign.  The APA contains multiple references to the existence of a Dealer Agreement which would provide the terms and conditions for the sale of products by Defendant to Plaintiff.  See Id. at p. 1 (Recitals stating that Plaintiff had previously

28 - OPINION & ORDER

entered into the 2007 Dealer Agreement and that Plaintiff desired its Brea, California dealership

be appointed as a RISO dealer and be authorized to sell RISO products and service "in

accordance with the terms of the Dealer Agreement"); Id. at § 3.9 (Defendant warrants that it is

not in breach of the Dealer Agreement, that Plaintiff is not in breach, and that Defendant has no

basis for suspecting that Plaintiff "may have breached the Dealer Agreement in the past"); § 4.3

(Plaintiff warrants it has adequate funds to fulfill its obligations under the Dealer Agreement as

an authorized dealer in the territories at issue); § 4.6 (Plaintiff warrants that it is not in breach of

the Dealer Agreement, that Defendant is not in breach, and that it has no basis to suspect

Defendant is in breach of the Dealer Agreement); § 5.7 (parties acknowledged that 2007 Dealer

Agreement had expired but was reinstated for ninety days during which parties were to attempt in

good faith to resolve issues surrounding the 2011 Dealer Agreement Defendant had previously

presented to Plaintiff so that the 2011 Dealer Agreement could replace the reinstated 2007 Dealer

Agreement); §§ 6.4, 7.4 (acknowledging amendment to Dealer Agreement).

The APA contemplated ongoing sales by Defendant to Plaintiff but only subject to an

executed Dealer Agreement and not by virtue of any provision in the APA itself.   The purpose

of the APA was for Defendant to sell business territories in California and Arizona to Plaintiff.

Ex. A-2 to Mar. 27, 2013 Hawkes Decl. at p. 1 (Recitals), at § 1.1 (defining assets).  This is

independent of any obligation for Defendant to continue to sell its products to Plaintiff.  Implying

a provision obligating Defendant to sell products to Plaintiff under the APA as a matter of law is

inconsistent with the terms of the APA absent the execution of a Dealer Agreement and is not,

therefore, a necessary implication.

The breach of contract claim is dismissed because the APA does not contain an express

obligation for Defendant to provide Plaintiff with products and implying such a term as a matter

of law is inappropriate for the reasons explained above.  Moreover, this dismissal is with

prejudice because the issue of contract interpretation is a matter of law and the complete APA is

in the record.  Any further amendment would be futile.

       The breach of the duty of good faith and fair dealing claim is also dismissed.  "[S]o long

as it is not inconsistent with the express terms of a contract, the duty of good faith and fair

dealing is a contractual term that is implied by law into every contract."  Eggiman v.

Mid-Century Ins. Co., 134 Or. App. 381, 386, 895 P.2d 333, 335 (1995) (internal quotation

marks omitted).  The purpose of the duty of good faith is to prohibit improper behavior in the

performance and enforcement of contracts, and to ensure that the parties "will refrain from any

act that would 'have the effect of destroying or injuring the right of the other party to receive the

fruits of the contract.'"  Iron Horse Eng'g Co. v. Nw. Rubber Extruders, Inc., 193 Or. App. 402,

421, 89 P.3d 1249, 1259 (2004) (quoting Perkins v. Standard Oil Co., 235 Or. 7, 16, 383 P.2d

107 (1963)).  The duty "does not operate in a vacuum[;]" rather it "focuses on the agreed

common purpose and the justified expectations of the parties, both of which are intimately

related to the parties' manifestation of their purposes and expectations in the express provisions

of the contract."  Or. Univ. Sys. v. Or. Pub. Emp. Un, 185 Or. App. 506, 515-16, 60 P.3d 567,

572 (2002).  The duty "cannot contradict an express contractual term, nor does it provide a

remedy for an unpleasantly motivated act that is permitted expressly by the contract."  Stevens v.

Foren, 154 Or. App. 52, 58, 959 P.2d 1008, 1011 (1998).

       Plaintiff argues that by refusing to continue to supply Plaintiff with products after March

31, 2013, Defendant violates the duty of good faith and fair dealing implicit in the APA.  But, the

30 - OPINION & ORDER

law imposes the "duty of good faith and fair dealing to facilitate performance and enforcement of

the contract when it is consistent with and in furtherance of the agreed-upon terms of the

contract, or where it effectuates the parties' objectively reasonable expectations under the

contract[.]"  Morrow, 212 Or. App. at 661-62, 159 P.2d at 388-89.  The "implied covenant of

good faith and fair dealing does not vary the substantive terms of the contract or impose

obligations inconsistent with the terms of the contract."  Id.  Because the APA contemplates the

sale of products to Plaintiff by Defendant only upon execution of a Dealer Agreement,

Defendant's refusal to sell products to Plaintiff absent such an agreement does not violate the

duty of good faith and fair dealing.  This claim is dismissed with prejudice.

### 2.  Jurisdiction and Venue

Even if I did not dismiss Plaintiff's contract-based claims for failure to state a claim, I

agree with Defendant that this Court lacks personal jurisdiction over Defendant in regard to those

claims.[10]  Fed. R. Civ. P. 12(b)(2).

Plaintiff has the burden of showing personal jurisdiction.  Boschetto v. Hansing, 539 F.3d

1011, 1015 (9th Cir. 2008).

> If the district court decides the motion without an evidentiary hearing, . . . then the
> plaintiff need only make a prima facie showing of the jurisdictional facts.  Absent
> an evidentiary hearing this court only inquires into whether the plaintiff's
> pleadings and affidavits make a prima facie showing of personal jurisdiction.
> Uncontroverted allegations in the plaintiff's complaint must be taken as true.
> Conflicts between the parties over statements contained in affidavits must be
> resolved in the plaintiff's favor.

Id. (citations and internal quotation marks omitted).

Generally, personal jurisdiction exists over an out-of-state defendant if (1) the forum

_____

[10]  I decline to address the separate improper venue argument.

31 - OPINION & ORDER

state's long-arm statute permits the assertion of jurisdiction, and (2) assertion of jurisdiction does

not violate due process.  Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1155 (9th Cir. 2006).

Oregon Rule of Civil Procedure (ORCP) 4 governs personal jurisdiction issues in Oregon.

Because Oregon's long-arm statute confers jurisdiction to the extent permitted by due process,

Gray & Co. v. Firstenberg Machinery Co., 913 F.2d 758, 760 (9th Cir. 1990) (citing ORCP 4L;

Oregon ex rel. Hydraulic Servocontrols Corp. v. Dale, 294 Or. 381, 657 P.2d 211 (1982)), I

proceed directly to the federal due process analysis.  See Harris Rutsky & Co. Ins. Servs., Inc. v.

Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003) (when state long arm statute reaches

as far as the Due Process Clause, court need only analyze whether the exercise of jurisdiction

complies with due process).

> To comport with due process, the nonresident defendant must have certain "minimum

contacts with the forum state such that the exercise of jurisdiction "'does not offend traditional

notions of fair play and substantial justice.'"  Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d

1218, 1223 (9th Cir. 2011) (quoting Int'l Shoe v. Wash., 326 U.S. 310, 316 (1945)).  The forum

state may exercise either general or specific jurisdiction over a nonresident defendant.

Boschetto, 539 F.3d at 1016.

> Plaintiff concedes there is no specific personal jurisdiction over Defendant in connection

with these claims.  Instead, Plaintiff contends that there is general jurisdiction or pendent

personal jurisdiction.

> "General jurisdiction exists when a defendant is domiciled in the forum state or his

activities there are 'substantial' or 'continuous and systematic.'"  Panavision Int'l, L.P. v. Toeppen,

141 F.3d 1316, 1320 (9th Cir. 1998) (quoting Helicopteros Nacionales de Colombia, S.A. v.

32 - OPINION & ORDER

Hall, 466 U.S. 408, 414-16 (1984)).  Because Defendant is not domiciled in Oregon, the question

is whether Defendant's activities here have been "substantial" or "continuous and systematic."

"It is the nature and extent of the contacts that determines whether they are 'substantial' or

'continuous and systematic.'  Longevity, continuity, volume, economic impact, physical presence,

and integration into the state's regulatory or economic markets are among the indicia of such a

presence." Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1172 (9th Cir. 2006) (internal

quotation marks omitted).  The lack of a regular place of business in the forum state is

significant, and is not overcome by a few visits.  Omeluk v. Langsten Slip & Batbyggeri A/S, 52

F.3d 267, 270 (9th Cir. 1995) (citing Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1331 (9th

Cir. 1984)).  Additionally, general jurisdiction cannot be predicated on "random, fortuitous, or

attenuated contacts." Core-Vent Corp. v. Nobel Indus., 11 F.3d 1482, 1490 (9th Cir. 1993)

(internal quotation marks omitted); see also Helicopteros, 466 U.S. at 410-11, 418-19 (no general

jurisdiction despite sales negotiations, purchasing of equipment, and training of personnel in

forum state); Gates, 743 F.2d at 1330-31 (no general jurisdiction despite several visits and

purchases in the forum, solicitation of a contract in the forum that included choice-of-law

provision favoring the forum, and letters, faxes, and phone calls sent into the forum).

The standard for establishing general jurisdiction is "fairly high," Brand v. Menlove

Dodge, 796 F.2d 1070, 1073 (9th Cir. 1986), and requires that the defendant's contacts be of the

sort that approximate physical presence. Gates, 743 F.2d at 1331; see also Tuazon, 433 F.3d at

1169 ("Put another way, a defendant must not only step through the door, it must also sit down

and make itself at home.") (internal quotation marks omitted).

It is undisputed that Defendant has never maintained an office, employee, telephone,

33 - OPINION & ORDER

mailing address, bank account, or registered agent for service of process in Oregon.  Mar. 27,

2013 Alexander Olshan Decl. at ¶ 11 (appended as Ex. B to Mar. 27, 2013 Hawkes Decl.).

Defendant is not licensed to do business in Oregon.  Id.  Defendant does not own or lease real

property in the state and has never owned a warehouse in Oregon.  Id. at ¶ 10-11.  Authorized

dealers in Oregon operate independently, purchasing RISO products at warehouse locations

outside Oregon.  Id. at ¶ 10.  Title and risk of loss passes to the dealer outside of Oregon and the

dealer then imports Defendant's products into Oregon.  Id. The Dealer Agreements contain a

choice of law provision under which the agreement is governed by Massachusetts law.  Id. at ¶ 9.

     Plaintiff relies on the Declaration of Philip Garcia, its service technician, who states that

Defendant sends representatives to Oregon to provide training to Plaintiff's technicians, to

provide technical service to Defendant's equipment on Plaintiff's sales floor, to accompany

Plaintiff's technicians on customer calls, and from "time to time," to visit Defendant's customers

in Oregon.  Garcia Decl. at ¶ 2.  However, he names only one employee of Defendant's who has

made visits to Oregon for these purposes, id. at ¶ 3, and fails to state how regularly or often these

visits have occurred.

     Plaintiff also relies on the Declaration of Rex Parker, Plaintiff's Portland Branch Sales

Manager, who states that in the last eight years, Defendant's representatives have regularly made

sales and technical visits to Oregon.  Parker Decl. at ¶ 2.  Parker states that Maggie Curry, Senior

Sales Engineer for Defendant, visited Oregon over the years, accompanied representatives on

sales calls in Oregon, and helped resolve technical issues.  Id. at ¶¶ 3-4.  Parker further states that

in 2011, Defendant's District Sales Manager Sidney Castle, who "has somewhat the same role

that [] Curry had]," has visited Plaintiff in Oregon and has gone on customer visits with Plaintiff

in Oregon.  Id. at ¶¶ 5-6.

Additionally, Parker states that Defendant's former representative Rob Clark used to visit customers and sales prospects in Oregon Id. at ¶ 7.  Finally, Parker generally states that he is aware of Defendant's representatives visiting Oregon to work with Plaintiff's technicians and "from time to time" to work directly with customers.  Id. at ¶ 8; see also Gary Plinario Dec. at ¶ 14 (noting that Defendant has its own service technicians in the field).  Other than using the word "regularly" and the phrase "from time to time," Parker provides no information as to the frequency of any of the visits he describes.

Given the high standard required to establish general jurisdiction, I conclude that Plaintiff fails to meet its burden.  The cases cited above indicate that Plaintiff must show more than some undefined number of visits by Defendant's employees to provide support to Plaintiff or other authorized dealers in Oregon.  As the Ninth Circuit has stated, "engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders." Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000); see also Congoleum Corp. v. DLW Aktiengesellschaft, 729 F.2d 1240, 1242-43 (9th Cir. 1984) (marketing efforts and hiring a non-exclusive sales agent in California were insufficient contacts to establish general personal jurisdiction in California; noting that "no court has ever held that the maintenance of even a substantial sales force within the state is a sufficient contact to assert [general] jurisdiction.").

An undefined number of discrete forum contacts by a handful of Defendant's representatives does not support general jurisdiction when considered with the other facts demonstrating that Defendant has no other physical presence in the state.  The contacts

established here are neither substantial nor continuous and systematic.  There is no general personal jurisdiction over Defendant for the contract-based claims.

Alternatively, Plaintiff argues that there is pendent personal jurisdiction over Defendant for these claims.  "[A] court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir. 2004).  "[T]he actual exercise of personal pendent jurisdiction in a particular case is within the discretion of the district court[,]" and is driven by considerations of "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties[.]" Id.

Plaintiff argues that the antitrust claim and the state law contract-based claims arise out of the same nucleus of operative facts.  I agree with Defendant that they do not.

The facts at issue in the contract-based claims relate to the terms of the APA and whether there has been a breach of the agreement for Defendant to sell its business territories in California and Arizona to Plaintiff.  As discussed above, the facts related to these claims involve the terms of the APA, what obligations those terms impose on Defendant, and whether Defendant has complied with the terms.  In contrast, the antitrust claim involves analyzing tie-ins, relevant markets, market power, and other issues that go to whether Defendant may require authorized dealers to purchase only RISO products.  Even if Defendant violated antitrust law, it is possible that there has been no breach of contract.  Conversely, there could be no violation of antitrust law, yet still a breach of the APA.  Therefore, the relevant facts for analyzing the breach

36 - OPINION & ORDER

of contract and duty of good faith and fair dealing claims are distinct enough that they do not

arise "out of a common nucleus of operative facts" with the antitrust claim.

CONCLUSION

The motion to dismiss [27] is granted.  Any amended complaint is due within fourteen

(14) days of the date of this Opinion & Order.

IT IS SO ORDERED.

Dated this _____ day of _____, 2013

_____
Marco A. Hernandez
United States District Judge

37 - OPINION & ORDER